John THOMAS, Plaintiff,

v.

Louis W. SULLIVAN, M.D., Secretary of Health and Human Services, Defendant.

No. 92 C 32.

United States District Court, N.D. Illinois, E.D.

Aug. 14, 1992.

Thomas Yates, John W. Whitcomb, Legal Assistance Foundation, Chicago, Ill., for plaintiff.

Ernest Ling, Asst. U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

John Thomas ("Thomas") appeals the final decision of Secretary of Health and Human Services Louis Sullivan ("Secretary") denying his claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i), 423(d).[1] Each of Thomas and Secretary has filed a motion for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, both motions are denied and the case is remanded to Secretary for reconsideration.

### Factual and Procedural Background

Thomas is now age 50, having been 48 years old at the time of the hearing re-

ferred to a bit later (Administrative Record ("R.") 47). He completed only a few years of grade school and cannot read or write (R. 49, 106). From 1968 to 1989 Thomas worked in the construction trade, operating a jackhammer, toting lumber, shoveling concrete and doing other miscellaneous jobs (R. 50–54, 61, 106–07). Thomas suffered a back injury while on the job in 1983 (R. 55).

There is some conflict about the limitations that the back injury imposed on Thomas. Administrative Law Judge ("ALJ") Larry Miller found, and Secretary argues on appeal, that Thomas told a contradictory and implausible story—first contending that he maintained a full work schedule until he suddenly became unable to work in 1989, then changing his version to one under which he did no substantial work from 1983 onward (R. 24).

Thomas describes his testimony very differently—he says that he did not grasp the ALJ's questions at first and merely clarified his testimony later on. Before the injury, he says, he ran the jackhammer for half a day while his partner ran it the other half. After the injury Thomas ran it as "[l]ittle as possible … [m]aybe an hour or two hours" (R. 75). He no longer toted lumber (R. 77) or shoveled concrete (R. 78), and he sat on the job when the boss was absent, though he knew he would have been fired if he had been caught doing that (R. 50). According to Thomas his partner "would take the load up off me," would "do different things for me to kind of help me out" and "[d]id this so I could make it" (*id.*). He testified that since 1983 he has not driven a car because his back pain leaves his legs unable to depress the pedals (R. 50). Thomas also claimed to have an ulcer (R. 69), asthma (R. 72) and ringing in the ears (R. 67–68, technically termed tinnitus, R. 222). He said the asthma has gotten considerably worse since he stopped working (R. 72).

Thomas quit work in 1989 when "[t]he [back] pain started getting too severe" (R. 56). He applied for disability insurance

---

**1.** Further citations to the statute will simply take the form "Section—". Pertinent regula-

tions, all of which are found in 20 C.F.R. § 404, will be cited as "Reg. § —".

benefits on June 9 of that year, alleging an onset date of May 8. That application was denied initially and on administrative reconsideration. Thomas then sought a hearing (the "Hearing"), which took place before Administrative Law Judge ("ALJ") Larry Miller on August 7, 1990. Evidence presented at the Hearing included live testimony (R. 43–83) by Thomas and by vocational expert Richard Hamersma, as well as a battery of medical reports (R. 87–196). ALJ Miller denied benefits in a written opinion dated November 30, 1990 (R. 18–26).

Next Thomas took his case to the HHS Appeals Council (R. 13). On October 31, 1991 the Appeals Council denied his request for review and adopted the opinion of ALJ Miller as Secretary's final decision (R. 3–4). This appeal followed.

### Rule 56 Principles

On summary judgment the court must rule in favor of the moving party if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Only when the record evidence would permit a reasonable factfinder to adopt the view of the nonmoving party is there a "genuine" issue (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Old Republic Ins. Co. v. Federal Crop Ins. Corp.*, 947 F.2d 269, 273–74 (7th Cir.1991)). Only when a fact would prove outcome-determinative under the substantive law is it "material" (*Pritchard v. Rainfair, Inc.*, 945 F.2d 185, 191 (7th Cir.1991)).

Rule 56 principles require the movant to establish the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In deciding whether that burden has been met, the court must draw "all reasonable inferences in favor of the nonmoving party" (*Allensworth v. General Motors Corp.*, 945 F.2d 174, 178 (7th Cir.1991)). On cross-motions the court must extend the required inferences to each party when considering the other's motion.

### Statutory and Regulatory Framework

Section 1382c(a)(3)(A) defines disability as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

*Young v. Secretary of HHS*, 957 F.2d 386, 389 (7th Cir.1992) (case citations omitted) explains the process that guides Secretary's evaluation of a disability claim:

> When considering whether a claimant is eligible for benefits, the Secretary uses a five-step inquiry: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments (the grid) that the Secretary acknowledges to be so severe as to preclude substantial gainful activity; 4) if the impairment has not been listed by the Secretary as conclusively disabling, is the claimant unable to perform his or her former occupation; and 5) if the claimant cannot perform the past occupation, is the claimant unable to perform other work in the national economy in light of his or her age, education and work experience. A negative conclusion at any step (except for step three) precludes a finding of disability. An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability. 20 C.F.R. § 404.1520 (1991). The claimant bears the burden of proof in steps one through four. If that burden is met, the burden shifts to the Secretary to prove that the claimant cannot perform other work in the economy.

Step 3 requires Secretary to assess whether the claimant has an impairment specified in the Listing of Impairments (Part 404, Subpt. P, App. 1). Impairments found in the Listing mandate a finding of disability because they are "severe enough to prevent a person from doing any gainful

activity" (Reg. § 404.1525(a)). Such a finding must rest on one of two conclusions: that the claimant's impairment corresponds directly to the requirements spelled out in the Listing, or that the claimant's impairment (or combination of impairments) is "medically equivalent" to a Listing although it does not match up precisely with the regulatory criteria (*id.* § 404.1526(a)).

Step 5 requires Secretary to decide whether the claimant can perform "sedentary," "light," "medium," "heavy" or "very heavy" work. Those levels of "residual functional capacity" ("RFC") are defined by Reg. § 404.1567. Secretary also assesses the claimant's age, education and work experience, known as claimant's "vocational factors" (Reg. §§ 404.1563–1565). Finally, Secretary consults the "grid" (Medical Vocational Guidelines of Part 404, Subpart P, Appendix 2). For each permutation of RFC and the vocational factors, the grid specifies whether or not a claimant will be deemed disabled.

### Standard of Review

District courts "decide[ ] disability cases ... by reviewing the final decision of the Secretary to ensure that it is supported by substantial evidence" (*Young*, 957 F.2d at 388). Reported cases regularly remind that "we may not decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the ALJ" (*Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987)). "Substantial evidence" means (*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)):

more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

"Substantial evidence may be something less than the greater weight or preponderance of the evidence" (*Young*, 957 F.2d at 389).

█ Every ALJ has a duty to explain with particularity the basis of his decision. To quote once again from *Young, id.* at

393, "within reasonable limits, the reason for rejecting evidence must be articulated if there is to be meaningful appellate review." *Stein v. Sullivan*, 966 F.2d 317, 319 (7th Cir.1992), quoting *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir.1988), expands on that concept:

[T]he level of articulation required is far from precise ... The requirement that the ALJ articulate his consideration of the evidence is deliberately flexible. "It is enough if the ALJ indicates the path of decision. The administrative tribunal need not spell out every step in the reasoning, if it provides enough of the steps that the full course may be discerned."

### ALJ Miller's Decision and Reasoning

At step 1 ALJ Miller found that Thomas was not gainfully employed (R. 25). At step 2 he found that Thomas suffered from severe asthma and low backache syndrome (*id.*). But the ALJ found at step 3 that those ailments did not meet or equal, either singly or in combination, any impairment found in the Listing (*id.*). At step 4 ALJ Miller adjudged Thomas incapable of doing his old construction job (R. 26). But he then found that Thomas could to "a wide range of medium work" (*id.*)—a category of activity that involves prolonged walking or standing, lifting a maximum of 50 pounds, and frequently lifting or carrying 20 pounds—so long as he did not work "around excessive pulmonary irritants or in a polluted environment" (R. 25).

Vocational expert Hamersma testified without contradiction that a significant number of jobs existed in the national economy for people of Thomas' age, education, physical capacity and skill level. Therefore at step 5 ALJ Miller deemed Thomas not disabled (R. 26).

ALJ Miller emphasized that he found Thomas' own testimony incredible (R. 24):

The claimant testified that in the space of one year, he went from working to being absolutely incapacitated, having to prop himself against the wall, and being unable to lift anything over five pounds. All this was attributed allegedly to longstanding impairments. The claimant had

trouble deciding on some important matters. He first testified that he continued to do the same work after his 1983 back injury, but at the end of the hearing, stated that he mostly loafed on the job. When asked if his longstanding asthma had gotten worse after he left work, the claimant replied that he cannot breathe. However, upon further questioning, he stated that he has been unable to breathe for seven or eight years.

Besides this, the claimant allegedly has constant pain from his ulcer, although he is not on a special diet and has gained 20 pounds since he left work. He has put on this weight and still by the time of the hearing, gave the impression of being healthy and vital, in spite of his testimony that he has to spend half his time lying on the floor, that he props himself against the wall to stand, and that he is unable to breathe and has been this way for seven or eight years.

Then the ALJ added that the medical evidence "does not lend [the pain testimony] more support" (*id.*). Evidence of low backache syndrome—without more—"connote[s] a lack of objective findings for the alleged symptoms" (*id.*). ALJ Miller noted the absence of any emergency-room treatment for asthma attacks, the lack of any acute spinal abnormality and the absence of any cardiac trouble among other factors (*id.*).

### Decision and Reasoning of Appeals Council

Administrative Appeals Judge David Harty sent Thomas a two-page letter explaining in summary fashion the denial of Thomas' request for review (R. 3–4). On appeal Thomas had submitted his outpatient medical records from Cook County Hospital (R. 197–235), which ALJ Miller had not seen. Those records reflect that Thomas suffers from duodenitis and gastritis (R. 197), as well as a hiatal hernia (*id.*), multiple herniated discs, with narrowing of the disc spaces in several places (R. 216–17, 223), mild to moderately severe sensorineural hearing loss in both ears (R. 221) and tinnitus (R. 222). Judge Harty responded that the records "are not inconsistent with the residual functional capacity established by the Administrative Law Judge" (R. 4).

Thomas had also asked the Appeals Council to reject the credibility finding and to accept that his symptoms were more severe than the ALJ had found. In that respect Judge Harty wrote that "neither the new evidence nor your representative's contentions are sufficient to alter the conclusions reached by the Administrative law Judge" (*id.*).

### Thomas' Arguments on Appeal

Thomas maintains (1) that his testimony was credible, (2) that this Court should assess his case under the new regulatory standard for pain assessment, and not under what had been thought to be the old standard in place at the time of the hearing, and (3) that the record as a whole—particularly the new evidence submitted to the Appeals Council—compels a finding of disability. Those arguments will be addressed in turn.

### 1. Credibility

It is undisputed that the medical evidence alone does not support a finding of disability. Instead Thomas argues that the combination of the medical evidence with his testimony about pain and symptoms requires a finding of disability. Discredit the testimony, as ALJ Miller did, and that legal construct comes tumbling down.

■ *Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir.1990) (citation omitted) is typical of the many cases stating that "[a]n ALJ's credibility determinations will be affirmed on appeal unless the appellant can demonstrate that they are 'patently wrong.'" Reviewing courts generally uphold credibility judgments because the trier of fact has a unique opportunity to observe and evaluate the witnesses. As *Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) has put it:

> [O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.

Accord, *Walker v. Bowen,* 834 F.2d 635, 641 (7th Cir.1987) (deference owed to credibility findings because ALJ "is in the best position to observe the witnesses"). There is a corollary to that proposition: Credibility rulings are more closely scrutinized when they rest on objective factors that are just as easily assessed on a cold record as in a warm courtroom (*Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512, emphasis added and citation omitted):

> This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict a witness' story; or *the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.* Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination.

Hence when objective inconsistency or fundamental implausibility is at issue, the ALJ has no special advantage over a reviewing court in determining credibility. Conversely a credibility determination may also be based on "intangible and unarticulable elements which impress the ALJ, that, unfortunately leave 'no trace that can be discerned in this or any other transcript that we review'" (*Kelley v. Sullivan,* 890 F.2d 961, 964 (7th Cir.1989)). In that situation the determination cannot be disturbed.

■ *a. Objective inconsistency.* ALJ Miller emphasized that he found Thomas' story (in the words of *Anderson* ) "so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." Yet a review of all the testimony shows the basic error of that conclusion.

For example, ALJ Miller stated that Thomas contradicted himself on the question whether his job duties were curtailed by the 1983 injury. What the record reflects, however, is not contradiction but miscommunication. Over and over the ALJ repeated or rephrased questions in a vain effort to get the information he wanted. His questions never became very precise. Neither did Thomas' answers. This example conveys the flavor of their dialogue (R. 51–52):

Q: Okay. Now, but my question is, whatever your job consisted of, did you have the same job the entire time you worked there?

A: No. They had different jobs.

Q: Well, let me see if I put it this way. You had different jobs you kept switching around there?

A: Yes, switching them around there.

Q: Okay. Now, did you continue to do the same switching during your entire employment there or did you have a separate job in any, you see what I'm asking?

A: Yes. Nothing, we had nothing special to do there.

Q: No. Whatever work you did, right?

A: Right.

Q: Okay. Did you continue to do the same work the entire time you worked there?

A: Well no, sometimes we run jackhammers, sometime we looked heavy office—

Q: No, you, you're not understanding my question. Let me try one more time, then you can try, Mr. Galatzer. Whatever your job was, right?

A: Right.

Q: This is this jackhammer work, the lifting and the pouring of the concrete, right?

A: Right.

Q: Okay. Did you continue to do these same duties your entire time on the job?

A: Yes, every day they did it, yes.

Q: Okay. So there was no change in your working condition or job duties during the entire length of your employment. Is that right?

A: That's right.

Later, when Thomas' attorney Daniel Galatzer asked him, in plain terms, some questions aimed at eliciting how (if at all) his *personal work habits* had changed after the injury, Thomas described how he had cut back very substantially on his operation

of the jackhammer, had stopped toting lumber entirely and had also stopped shoveling concrete altogether (R. 73–78). In objective terms, that later testimony must be seen as a clarification and not a contradiction of the earlier testimony about whether his "working condition or job duties" changed after the injury. It appears that Thomas took the ALJ's original inquiry about "working condition or job duties" to mean his job description—not whether he actually fulfilled the duties as required.

With the notion of internal contradiction discarded, the charge of implausibility drops away as well. Thomas did not testify (as the ALJ put it) that "in the space of one year, he went from working to being absolutely incapacitated" (R. 24). What Thomas described instead was a sharp deterioration in his ability to perform at work after 1983, followed by a further deterioration culminating in his decision to quit in 1989. Nor did Thomas offer contradictory testimony about his asthma, as ALJ Miller also asserted. Instead Thomas simply stated that the asthma had bothered him for years (including his working years) but had recently gotten worse (R. 74).

Perhaps ALJ Miller meant to say that Thomas gave the impression of being evasive, deliberately obtuse or plagued with a faulty memory. Such a determination—if it had been made—could not be disturbed. But the ALJ's opinion rather purports to reflect a reliance on objective factors. And all that the record suggests on that score is that Thomas and ALJ Miller were simply talking past each other: Thomas seems to have been quite inarticulate, and ALJ Miller was neither patient nor precise enough to overcome that problem. Thomas—an illiterate lifelong laborer with a fourth-grade education—should not be penalized for such miscommunication.

This analysis does not necessarily compel outright reversal of the ALJ's credibility finding. At a minimum, though, it requires that the ALJ must better articulate the grounds of his decision so that "meaningful appellate review" is possible (*Young,* 957 F.2d at 393). Secretary must distinguish between objective and intangible grounds for the credibility determination. Otherwise a reviewing court cannot know whether the deference owed to intangible determinations is due here.

■ *b. Thomas' physical appearance.* ALJ Miller also predicated his credibility judgment on Thomas' "healthy and vital" appearance at the hearing. True enough, an ALJ may rely on personal observation of the claimant as grounds for a credibility judgment (see, e.g., *Kelley,* 890 F.2d at 964). But ALJs may not "play doctor" by relying on their own lay opinions in a context where medical evidence must control (see, e.g., *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.1990)).

■ Any claimant's credibility obviously suffers when the claimant's appearance or conduct contradicts specific claims of disability. That was the case in *Kelley,* where the claimant alleged that she could not sit comfortably but then sat through a hearing without difficulty. To take an exaggerated example: Any layperson (in the medical sense) is able to tell that a claimant is lying when he or she alleges crippling pain, then does handsprings in front of the ALJ.

That rationale does not apply here, however, and ALJ Miller overstepped his bounds when he relied on his personal observations of Thomas. Thomas never claimed that he was unable to sit for the duration of a brief hearing. He mentioned that he took pain medication (R. 58), and ALJ Miller did not ask if he was medicated at the time of the hearing. Nor are Thomas' ailments the kind that would normally cause a debilitated appearance.

Similarly, ALJ Miller noted that Thomas was not on a special diet and that he had gained 20 pounds since leaving work despite supposedly constant stomach pain from an ulcer. Whether Thomas' weight gain (perhaps a consequence of inactivity?) and normal diet give the lie to his claims of gastric illness are questions for a doctor, not a lawyer.

*c. Conclusion.* In short, the ALJ's credibility determination was either (1) patently wrong if bottomed on notions of ob-

jective inconsistency or (2) inadequately articulated if based on the ALJ's subjective judgment of Thomas' truthfulness. ALJ Miller's reliance on personal observation was improper because nothing about Thomas' complaints conflicted with his appearance or conduct as described in the record—at least insofar as a layperson could make such an evaluation.

### 2. Pain Standard

There would be no point in remanding on the credibility issue unless Thomas had some chance of success on the merits if he were to be found credible. This opinion therefore necessarily takes up the issue of what pain standard should govern this case.

■ On November 14, 1991 Secretary and his subordinates began to apply new regulations when evaluating a disability claimant's allegations of pain (56 Fed.Reg. 57,928–48) (1991), to be codified as Reg. § 404.1529 (1992)). That new regulation has displaced former Reg. § 404.1529, which had stated:

> We will never find that you are disabled based on your symptoms, including pain, unless medical signs or findings show that there is a medical condition that could reasonably be expected to produce those symptoms.

Interpreting the old rule, our Court of Appeals has held (*Moothart v. Bowen*, 934 F.2d 114, 117 (7th Cir.1991) (emphasis in original)):

> A claimant must provide credible testimony to obtain disability benefits based on pain or other subjective symptoms, *and* the objective medical findings must show a condition that would reasonably be expected to produce that pain or those other symptoms.

See also *Walker*, 834 F.2d at 641.

In sharp contrast, the new Reg. § 404.1529(c)(2) says:

> However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statement.

That new regulation unmistakably undermines the requirement stated in *Moothart* and like cases that pain allegations must always be corroborated by objective medical findings.

In response, Secretary does a fair impression of one of the old Jimmy Durante patter songs ("Did you ever have the feeling that you wanted to go, and then have the feeling that you wanted to stay?"). In his preface to the new regulations Secretary insists that the revisions effect no substantive change in policy (56 Fed.Reg. at 57,931)—in which case any notion of choosing between the regulations must be meaningless, for either regulation would produce the same result. But in his brief in this case Secretary concedes that the new regulations effectively overrule *Moothart*, thus materially changing the law of this circuit (Secretary Mem. 11). Nonetheless Secretary urges the application of the old regulations and the *Moothart* gloss, because the new regulations are not explicitly stated to be retroactive.

As "support" for that argument Secretary cites this Court's opinion in *Grindle v. Sullivan*, 774 F.Supp. 1501, 1510 (N.D.Ill. 1991). There, Secretary Mem. 10–11 declares, this Court rejected the proposition that new disability regulations should apply retroactively. Not so—*Grindle* held just the opposite. On remarkably similar facts (dealing with a new regulation that was acknowledged not to represent a change in Secretary's policy, but that did modify or clarify Seventh Circuit case law) this Court ordered the retroactive application of the regulations on the ground that the usual notions of retroactivity—the retrospective application of a *change* in the law—were not implicated at all (774 F.Supp. at 1509–10).

In terms of the new regulation now at issue, if it does not in fact change HHS policy, but still operates to eviscerate the *Moothart* rule, then *Moothart* was "wrongly" decided—though it is hardly fair to find fault with our Court of Appeals for that. After all, *Moothart*, 934 F.2d at 117 at-

tempted to do nothing more than interpret HHS policy:

> [T]he standard is not ours to set. It is HHS' regulatory standard, specifically endorsed by Congress, that is at issue.

Secretary has now clarified that his standard is *and was* less severe than the *Moothart* court justifiably believed.

Secretary has effectively conceded, then, that *Moothart* was "wrongly" decided: that the Court of Appeals had been led down the garden path that Secretary had then marked out. On the heels of that concession, Secretary cannot possibly contend that the old regulations or the *Moothart* gloss should govern this case. This Court therefore holds that the November 14, 1991 regulations apply on this appeal and must be applied on remand.

■ To return to the particular facts of this case, ALJ Miller's ruling cited both (1) his own finding that Thomas was incredible *and* (2) the absence of objective medical evidence to support Thomas' claims (R. 24–25). If Thomas' testimony was in fact credible, then ALJ Miller in effect rejected the pain testimony *solely* because of the lack of corroborative medical evidence.[2]

That logic plainly violates the policy of the new Reg. § 404.1529. Under that new regulation, it is at least plausible that Thomas could be found disabled based on his pain testimony and the undisputed evidence of his asthma and back trouble. But that sort of judgment, involving as it does the need to review and weigh medical evidence, is more properly made by an ALJ and not in the first instance by a reviewing court. Thus a remand is required to consider both the credibility issue and the proper application of the new regulation to the evidence of record.

Let it be clear that this holding does not necessarily entitle Thomas to benefits. Under both the old and new regulations, cor-

roborative medical evidence provides the surest basis for a finding of disability. What the new Reg. § 404.1529(c) says is that Secretary may not reject complaints of pain "solely" for lack of corroborative evidence. Surely the lack of medical evidence may still provide one reason for rejecting complaints of pain—just not the only reason.

Other factors also play a role in the evaluation of pain claims, including the claimant's daily activities, reliance on medication and treatment history (Reg. § 404.-1529(c)(3)). But the chances are that a claimant who cannot proffer supporting medical evidence must rely in the end on the ALJ's perception of his or her credibility.

### 3. *Appeals Council action.*

■ As already noted, Thomas submitted about 40 pages of medical records to the Appeals Council that had not been tendered to ALJ Miller. In his initial brief Thomas argued that the new records undercut the validity of Secretary's decision to deny benefits. Secretary countered that this Court had no authority to review the new evidence when the Appeals Council had denied review and adopted the ALJ's original decision as Secretary's own (a subject on which this Court had previously differed with Secretary, see *Maxwell v. Sullivan,* 792 F.Supp. 582, 592 (N.D.Ill. 1992)).

After the briefs were submitted *Scivally v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir. 1992) resolved that legal dispute in Thomas' favor:

> When the Appeals Council denies review and concludes that the ALJ's determination is final, the court reviews the ALJ's determination as well as any new evi-

---

**2.** This Court should not be misunderstood as subscribing to Thomas' repeated arguments that because doctors have *recorded* his complaints, they have *confirmed* those complaints (see, e.g., his Mem. 12 (referral to pain clinic shows that Thomas' condition could reasonably cause disabling pain); *id.* 14 (doctors "regularly noted Thomas' complaints of pain")). Every doctor must dutifully record a patient's complaints and call in specialists if necessary to investigate the complaints—but just because that process is termed taking a patient's medical "history," that does not reflect the doctor's determination that the "history" is factually sound. Such steps do not amount to a finding or diagnosis.

dence which the Appeals Council may have found to be immaterial.[3]

But this Court's review of the new evidence does not alter its earlier conclusion that a remand, rather than an outright award of benefits to Thomas, is the most appropriate resolution of the current appeal.

At issue are the outpatient records from Cook County Hospital, which indicate the presence of duodenitis and gastritis, a hiatal hernia, multiple herniated discs, narrowing of the disc spaces in several places, hearing loss and tinnitus. That evidence collectively reflects that Thomas does indeed have medical problems in abundance—at least as severe as ALJ Miller found, and perhaps more severe. It may well be that those records, when properly interpreted by medical experts, will provide all the objective support needed for a finding of disability.[4]

But Secretary, and not this Court, is charged with the task of evaluating and weighing the medical evidence in the first instance. This Court's only instruction is that the Cook County Hospital evidence is to receive full consideration on remand, despite the fact that the original ALJ did not have the chance to consider it.

### Conclusion

It is not possible to assess whether, if all relevant factors had been taken into account, substantial evidence would support a denial of benefits. Even more important, it is not possible to determine whether Secretary would deny benefits at all in light of all the relevant factors. Reconsideration of the credibility finding, and of the significance of the new regulation and the Cook County Hospital evidence, may significantly change Secretary's position.

Secretary's first task on remand is to reconsider the credibility determination. It may be the case—but it may not—that all that is required is a better explanation of that determination. Second, a new analysis of Thomas' pain allegations will also be required. That analysis must be consistent with the November 14, 1991 regulations. Finally, the Cook County Hospital records are to be given all the weight that they would have deserved had they been part of the original record. Secretary may conduct additional fact-finding on remand to the extent necessary, as may be permitted by the statute and regulations.[5]

Both motions for summary judgment are denied. This case is remanded to Secretary for proceedings consistent with this opinion.

3. [Footnote by this Court] It is to the United States' credit that it asked leave, by a later-filed motion, to cite *Scivally* (a case of which this Court was already aware but Thomas' counsel may not have been)—a decision that Secretary expressly acknowledged was adverse to his previously-asserted legal position. Although Rule of Professional Conduct 3.3(a)(3) does impose a responsibility to do just that, its requirements are regrettably not always adhered to. In any case, *Scivally* has mooted Secretary's original effort, in a half dozen closely-spaced and footnote-ridden pages (Mem. 17–22), to argue (incorrectly) that this Court's *Maxwell* opinion was mistaken in its reading of, and its adherence to, earlier Seventh Circuit case law.

4. Two reviewing physicians had found before the Hearing that Thomas could do medium work (R. 169, 177). But by definition those evaluations, necessarily based only on the medical records that had been presented to the re-

viewing doctors, did not consider the later-submitted Cook County Hospital records. Any new RFC determinations would of course have to take *all* of the evidence into account.

5. This Court has considered whether or not this opinion should also include a direction that the case be assigned to a new ALJ on remand. That poses a close question for the reason stated in this footnote, but on balance this Court has decided against such a mandate in favor of leaving the decision to Secretary. But in resolving that question Secretary should be mindful of the human tendency (even without a conscious decision to do so) to justify or validate one's previously-reached conclusions—precisely the same consideration that underlies our Court of Appeals' Circuit Rule 36 and our District Court's General Rule 44, each of which *requires* a reassignment to a new judge on remand for a new trial.